ORIGINAL

#07713

FILED

AUG 2 0 2014

U.S. COURT OF
FEDERAL CLAIMS

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| AAL GROUP, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No.: 14 - 756C |
| | ) |
| THE UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT

Plaintiff AAL Group, Ltd. ("AAL") brings this Complaint against Defendant The United States of America acting through the United States Department of the Army, Army Contracting Command – Redstone (the "Government"), seeking a declaratory judgment interpreting the subject contract and a monetary award. In support hereof, AAL shows the Court as follows:

## NATURE OF THE ACTION

1.      Pursuant to the Contract Disputes Act 41 U.S.C. § 7104(b)(1), the Federal Acquisition Regulation ("FAR") clause 52.233-4 and the Prompt Payment Act 31 U.S.C. § 3903, AAL appeals the contracting officer's final decision rejecting AAL's interpretation of Contract No. W91B4M-11-C-0007, a commercial items contract (the "Contract"), and denying its claim for $9,237,275.83 in costs incurred / monies owed under the Contract. AAL seeks a



RECEIVED

AUG 2 0 2014

OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

declaratory judgment interpreting the Contract as well as a monetary award of all sums due under the Contract.

## PARTIES

2.    AAL is organized under the laws of the British Virgin Islands, and maintains its principal place of business in Sharjah, UAE. AAL provides, among other things, repair and overhaul services for various aircraft, including the Mi-17/Mi-171 aircraft.

3.    The United States Department of the Army is one of three (3) military departments of the United States Department of Defense, an executive agency of the United States Government. The Secretary of the Army has cognizance over the Department of the Army, subject to the direction of the Secretary of Defense and the President of the United States. The Army Contracting Command is headquartered at Redstone Arsenal in Alabama, and provides contracting support for the United States Army.

## JURISDICTION

4.    This Court has jurisdiction over this action and the parties thereto pursuant to 28 U.S.C. § 1491(a) (1) and 41 U.S.C. § 7104(b)(1).

## BACKGROUND

5.     The Contract required the prime contractor to perform repair and overhaul of Mi-17/Mi-171 aircraft in accordance with Original Equipment Manufacturer specifications.  The place of performance under the Contract was Afghanistan.  The Contract was bid, awarded and funded in U.S. Dollars.

6.     The Government initially negotiated the effort with AAL.  Due to internal policy, however, the Government decided to award the contract to a local entity.  After a lengthy search, AAL found a local entity, Afghanistan Rotary Logistic ("ARL"), to serve as prime contractor.  The Government awarded the Contract to ARL on December 7, 2010.  In turn, ARL subcontracted with AAL because AAL held the necessary licenses, facilities, and expertise to execute the Contract requirements.

7.     Because ARL was the prime contractor under the Contract, and was an Afghan entity (*i.e.*, a "host nation vendor"), the Government insisted that payment for services rendered and/or goods provided under the Contract be made in Afghani, remitted to an Afghan bank.  The Contract contained no such requirement.  As a consequence of the Government's insistence on that extra-contractual requirement, AAL suffered substantial currency exchange losses on the invoices submitted for its work as a subcontractor to ARL.  AAL also received a

3

number of underpayments which it later learned to have been caused by the Government's mismanagement of Contract Line Item Number ("CLIN") funding.

8.    During the period in which ARL served as the prime contractor, payments for AAL's work were deposited, in Afghan currency, into ARL's Afghan account (the "ARL Account"). Afghan banks were being forced to serve as *de facto* tax collectors for the Afghan government and were scrutinizing all deposit accounts for revenue opportunities. The Afghan bank holding the ARL Account identified the ARL Account as one to scrutinize. As a consequence, the ARL Account was frozen pending the aforementioned scrutiny, and ultimately subjected to substantial after-imposed taxes by the Afghan government. Consequently, neither ARL nor AAL were fully paid for the services that they rendered under the Contract as originally awarded.

9.    In an effort to address the payment problems, ARL and AAL requested that the Contract be novated to AAL. The motivation for the request was the fact that AAL - - unlike ARL - - was not an Afghan entity. Thus, ARL and AAL's intent in proposing and drafting the novation was to cause the prime contractor under the Contract to be a non-Afghan entity, so that the Government could avoid the extra-contractual requirement that it imposed and remit payment in U.S. Dollars to a non-Afghan bank account. Without such a novation, any

payment made under the Contract would have been held hostage by the Afghan government.

10.     During the negotiation of the novation, ARL and AAL made their intent and reasoning for the proposed novation very clear to the Government: they wanted the Contract novated to a non-Afghan entity so that the payments could be made in U.S. Dollars to a non-Afghan bank. Their reasoning was buttressed by various actions by the Government regarding the extra-contractual payment requirement that it imposed. On April 24, 2013, the Department of Defense issued a class deviation (the "Class Deviation"). The Class Deviation was properly promulgated and published in accordance with FAR 1.404 and was immediately effective for all solicitations for performance in Afghanistan. The Class Deviation provided as follows:

NOTIFICATION OF PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (APR 2013) (DEVIATION 2013-O0011)

(a)     Pursuant to the authority of USCENTCOM FRAGO's 09-1567 and 10-143, this contract will be awarded in Afghani (local currency) if awarded to a host nation vendor. The Contractor will receive payment in local currency via Electronic Funds Transfer (EFT) to a local (Afghan) banking institution. Contracts/purchase orders shall not be awarded to host nation vendors who do not bank locally. If awarded to other than a host nation vendor, the contract will be awarded in US dollars.

(See Exhibit A hereto.)  The Class Deviation further clarifies the Government's intent to impose the extra-contractual Afghan payment requirement <u>only</u> on host nation vendors.

11.    On May 2, 2013, the Government issued Contract Modification No. P00021, which incorporated Joint Theater Support Contracting Command Local Instruction 952.232-0004 (the "LI"), which stated in relevant part:

> PAYMENT IN LOCAL CURRENCY (AFGHANISTAN)
> DEC/2011
> Pursuant to the authority of USCENTCOM FRAGO's 09-1567 and
> 10-143 this contract is awarded in Afghani (local Currency), if
> awarded to a host nation vendor.  The contractor will receive payment
> in local currency via electronic Funds Transfer to a local (Afghan)
> banking institution.

(See Exhibit B hereto.)  Once again, the Government clearly indicated its intent that the extra-contractual Afghani payment requirements be applied <u>only</u> where the prime contractor was Afghani.

12.    ARL and AAL executed a novation agreement dated April 7, 2013 and submitted it to the Government on April 12, 2013 (the "Novation").  On May 3, 2013, one day after incorporating the LI into the Contract, the Government accepted and incorporated the Novation via Contract Modification No. P00022.

13.    Particularly in light of the Class Deviation and the LI, both of which were issued prior to the Government's acceptance of the Novation, AAL presumed that the Novation would eliminate the impediments to its ability to receive payment and that it would be paid for its services, in U.S. Dollars, remitted to a non-Afghan bank account.  Indeed, such a result was required by the Contract. Unfortunately, however, the required result did not occur.

14.    Despite the Novation, the Government took the position that any payment to AAL under the Contract had to be made in Afghani to an Afghan bank account.  Furthermore, from the date of the Novation, the Government refused to process any invoices until AAL provided payment information for an Afghan bank account.  However, AAL could not obtain an Afghan bank account because it is not an Afghan entity, a fact which was made clear to the Government.

15.    AAL made myriad attempts to convince the Government of the error in its position, to no avail.  Ultimately, having never been fully paid for its services, and facing the prospect of continued performance without payment, in an effort to mitigate its loses and receive partial payment, AAL offered to accept payment in Afghani provided that payment was made to a non-Afghan account, and submitted two (2) invoices designed to accomplish that end.  The Government refused to pay either of these invoices and insisted that AAL obtain an Afghan

7

bank account for payment.  The Government continued to assert that payment in anything but local Afghani to anything but a local Afghan bank account was impossible.

16.     Its efforts having been once again thwarted by the Government's misplaced insistence on paying in Afghani delivered to an Afghan account, AAL again attempted to obtain partial payment (accounting for exchange losses) by providing the Government with the bank account information for its sister company, AAL Afghanistan (an entity separate and distinct from AAL).  Unlike AAL, AAL Afghanistan was an Afghan entity and was able to obtain an Afghan bank account.  AAL clearly indicated to the Government that the bank account belonged to AAL Afghanistan, not AAL (which, of course, was the prime contractor on the Contract).  It was AAL's understanding that, upon receipt of payment by the Government, AAL Afghanistan would be able to transfer the funds to AAL.

17.     After several meetings in July of 2013, the Government finally agreed to process six of the seventeen invoices that AAL had submitted.  With respect to the six invoices that the Government agreed to pay, the Government insisted that it would only make payment at a "predetermined contractually mandated exchange rate" of between 40-50 Afghanis per U.S. Dollar.  This was yet another extra-

contractual obligation imposed by the Government. There was no authority for the Government to use said "predetermined contractually mandated exchange rate," which was significantly lower than the floating rate. Desperate for funding, as a further effort to mitigate its losses, AAL converted its invoices, which were originally in U.S. Dollars, to Afghanis by applying the "predetermined contractually mandated exchange rate."

18.     On or about July 24, 2013, the Government (belatedly) processed the six invoices and, without explanation, paid in U.S. dollars, but only after converting the Afghani invoice price at the then-current exchange rate of 56.120. The Government arbitrage resulted in payment to AAL in an amount substantially less than that required by the Contract, which was bid and funded in U.S. Dollars. The arbitrage loss was not the only problem that AAL encountered with these payments.

19.     Just as the monies remitted to ARL were frozen by the Afghan bank into which they were remitted, the bank into which the aforementioned payment to AAL Afghanistan was deposited, the Afghanistan International Bank ("AIB") likewise froze the funds remitted to AAL Afghanistan's account. AIB refused to release the funds to AAL Afghanistan unless it produced a contract with the U.S. Army. Obviously, because AAL Afghanistan did not have a contract with the U.S.

Army, no such contract could be produced. AAL Afghanistan and AAL tried to explain the situation to AIB, but the AIB officials refused to engage in meaningful dialogue with AAL. Consequently, AAL was unable to access funds it desperately needed.

20.    After expending substantial resources and energy in negotiating with the Afghan government and trying to open an Afghan bank account (which efforts were unfruitful due to the Afghan banking regulations), without obtaining requested assistance from the contracting officer, AAL was ultimately forced to reject and return the money to the Government. The Government refused the returned funds, however, and insisted that they be accepted by AAL. Unbeknownst to AAL, the Government contacted AIB to discuss access to the said funds. The Government's explanation, as reflected by its correspondence with AIB, was that a meeting between AAL and the CEO of AIB would resolve the issues. Unfortunately, however, AAL's efforts to have such a meeting and gain access to the said funds were unsuccessful, and the funds were ultimately returned to the Government.

21.    AAL's difficulties in dealing with the Government on the Contract were not limited to payment issues. The Afghan government repeatedly harassed AAL during contract performance, in part because AAL was not co-located other

government contractors. In December 2012, Afghan Customs seized a number of pieces of equipment necessary for Contract performance on an AAL flight. The Government and AAL coordinated all details of the flight more than a month before AAL's flight was scheduled to land. The Government explicitly agreed to obtain the necessary landing clearances from and inform the Afghan government that the equipment was for a government contract and therefore exempt from taxes. Despite the Government's agreement, it failed to obtain the necessary clearances. Because of the Government's failures, the Afghan government seized all equipment on the flight. Notwithstanding AAL's many requests, the Government refused to interface with the Afghan government. While AAL was ultimately able to recover the seized equipment, it only did so at considerable expense.

22.    On or about March 14, 2014, AAL submitted a Certified Claim to the Government's contracting officer, seeking $9,237,275.83. A true and correct copy of the said Certified Claim, not including the exhibits thereto, is attached hereto as Exhibit A. On or about July 16, 2014, the Government's contracting officer issued his final decision, denying AAL's claim and continuing to insist that the Government will pay AAL only in Afghan currency remitted to an Afghan bank. A true and correct copy of the final decision is attached hereto as Exhibit B.

11

23.     The Contract was bid, awarded and funded in U.S. Dollars.  There is no requirement in the Contract imposing the extra-contractual payment restrictions upon which the Government insists.  Even if such terms did exist, however, the novation of the Contract substituted AAL for ARL, meaning that the prime contractor was not a "host nation vendor."  Accordingly, the effect of the novation was to require the Government to pay AAL in U.S. Dollars to a non-Afghan bank.

24.     The Government's insistence on the aforementioned inapplicable extra-contractual payment terms has prevented AAL from being compensated for its work under the Contract, and is tantamount to a refusal to pay AAL.  Furthermore, the Government's refusal to cooperate with AAL, all as aforesaid, has caused substantial losses to AAL.

## PRAYER FOR RELIEF

WHEREFORE, AAL prays that this Court conduct a *de novo* review of AAL's certified claim and, based upon consideration of the evidence presented, provide relief to AAL as follows:

A.      Declare that the Contract requires the Government to pay the sums due AAL under the Contract, in U.S. Dollars, delivered to a non-Afghan bank account, as designated by AAL;

B.      Award AAL $7,416,826.45, due for work completed but for which payment has not been received, due to a dispute regarding contractual payment terms;

C.      Award AAL $6,133.46, due for costs associated with attempting to negotiate opening of bank account in Afghanistan;

D.      Award AAL $803,785.88, due for losses resulting from improper currency conversion for payments made between January 2011 and March 2013;

E.      Award AAL $976,398.10, due to CLIN value errors / misapplied payments made by DFAS on payments made between January 2011 and March 2013;

F.      Award AAL $34,131.94, due for losses resulting from the Government's failure to intervene after the Afghan government denied AAL landing rights and from the Government's failure to process necessary paperwork allowing AAL to land, for a total amount of $9,237,275.83; and

G.      Award AAL such other and further relief as the Court deems mete and proper.

        Respectfully submitted this the 19th day of August, 2014.

                                                W. Brad English
                                                Alabama Bar ASB-5240-A43E
                                                benglish@maynardcooper.com

**OF COUNSEL:**

Gary L. Rigney
J. Andrew Watson, III
Jon D. Levin
Emily J. Chancey
MAYNARD, COOPER & GALE, P.C.
655 Gallatin Street
Huntsville, Alabama 35801
Office: (256) 551-0171
Fax: (256) 512-0119

Exhibit A



April 9, 2014

Ms. Teresa Y. Mayberry, Contracting Officer
Army Contracting Command – Redstone
215 Wynn Drive, Suite 201
Huntsville, AL 35805

         Re:      Certified Claim under Contract Number W91B4M-11-C-0007

Dear Ms. Mayberry:

       AAL Group, Ltd., ("AAL") submits this claim for $9,237,275.83 in costs incurred under Contract No. W91B4M-11-C-0007, a commercial items contract (the "Contract"). This claim, which is a non-routine matter in dispute between AAL and the United States Army, Army Contracting Command – Redstone (the "Government"), is submitted pursuant to the Contract Disputes Act and Federal Acquisition Regulation ("FAR") clause 52.212-4(a)(3), which cites FAR 52.233-4 Applicable Law for Breach of Contract Claim (OCT 2004) (Pub. L. 108-77, 108-78), and the Prompt Payment Act ("PPA"), 31 U.S.C. § 3903.

       AAL has performed every requirement in accordance with the specifications and statement of work in the Contract and the Government has accepted the benefit of such performance. The Government insists that any payments to AAL under the Contract be made to an Afghan bank account, in Afghan currency ("Afghani"). The Government's position is contrary to the terms of the Contract. As described in detail below, despite its efforts to mitigate its damages and cooperate with the Government, AAL has been unable to receive payment in the manner and method chosen by the Government. Thus, AAL has been without payment for services rendered and accepted by the Government since November of 2012.

       As provided for in FAR 52.233-1(e), AAL requests a final contracting officer's decision in writing on this claim within 60 days. The attached documents provide the necessary support for this claim.

## FACTUAL BACKGROUND

       The Contract requires the prime contractor to perform repair and overhaul of Mi-17/Mi-171 aircraft in accordance with Original Equipment Manufacturer specifications. The Government initially negotiated the effort with AAL. Due to internal policy, however, the Government decided to award the contract to a local entity. After a lengthy search, AAL found a local entity, Afghanistan Rotary Logistic ("ARL"), to serve as prime contractor. The Government awarded the Contract to ARL on December 7, 2010. In turn, ARL subcontracted with AAL because AAL held the necessary licenses, facilities, and expertise to execute Contract requirements. Because ARL performed no work on the Contract, the Government paid AAL's invoices directly.

       The Government insisted that AAL receive payments in an Afghan bank. Although services under the Contract are performed in Afghanistan, AAL operates from its headquarters in Sharjah, UAE and is organized under the laws of the British Virgin Islands. As a matter of Afghan law, AAL was (and remains) barred from setting up an account at an Afghan bank. Accordingly, the Government made payment to AAL through an Afghan bank account set up and nominally owned by ARL (the "ARL Account").

April 9, 2014
Page 2 of 2

Between approximately January 2011 and February 2013, AAL submitted invoices directly to and received payment directly from the Government. These payments were repeatedly delayed. For example, the final payment AAL received was in February 2013 - - for a November 2012 invoice. Although AAL was paid during this approximate timeframe, the Government insisted on remitting payment in Afghani because ARL was a host nation vendor. As a result, AAL suffered substantial losses during this time due to the exchange of currency required to transfer the funds to an AAL account. Additionally, the Government often failed to pay AAL the amount invoiced, issues AAL was required to protest repeatedly. As AAL later learned, having received a copy of an audit performed on the Contract by the Defense Finance and Accounting Service ("DFAS"), the reason for these underpayments was the Government's mismanagement of Contract Line Item Number ("CLIN") funding.

The Afghan government repeatedly harassed AAL during contract performance, in part because the company was not co-located other government contractors. In December 2012, Afghan Customs seized a number of pieces of equipment necessary for Contract performance on an AAL flight. The Government and AAL coordinated all details of the flight more than a month before AAL's flight was scheduled to land. The Government explicitly agreed to obtain the necessary landing clearances from and inform the Afghan government that the equipment was for a Government contract and therefore exempt from taxes. Despite the Government's agreement, it failed to obtain the necessary clearances. Because of the Government's failures, the Afghan government seized all equipment on the flight. Despite AAL's many requests, the Government refused to interface with the Afghan government. While AAL was ultimately able to recover the seized equipment, it only did so at considerable expense.

During the period in which ARL served as the nominal prime contractor, the ARL account that was AAL's only means of being paid was frozen by the Afghan government. As ARL explained to the Government, Afghan banks were being forced to serve as *de facto* tax collectors for the Afghan government and were scrutinizing all deposit accounts for revenue opportunities. Thus, any payment by the Government to an Afghan account was frozen pending the aforementioned scrutiny, and ultimately subjected to substantial after-imposed taxes by the Afghan government.

Despite the Government's knowledge of the problems arising from its manner and method of payment, it nevertheless insisted that all payments remitted for services rendered under the Contract be made to an Afghan bank. As AAL and ARL feared, numerous payments that the Government remitted to the ARL Account were in fact frozen and kept beyond ARL's and AAL's reach. Consequently, neither ARL nor AAL were paid for the services that they rendered under the Contract as originally awarded.

Because the Government refused to take action to address the impediments to paying its contractors, ARL and AAL were faced with the prospect of being required to continue performance without payment. In an effort to address the payment problems, ARL and AAL requested that the Contract be novated to AAL. The motivation for the request was the fact that AAL - - unlike ARL - - was not an Afghan entity. Thus, ARL's and AAL's intent in proposing and drafting the novation was to cause the prime contractor under the Contract to be a non-Afghan entity, thereby permitting the Government to remit payment in U.S. Dollars to a non-Afghan bank account. Without such a novation, any payment made under the Contract would continue to be held hostage by the Afghan government.

April 9, 2014
Page 3 of 3

During the negotiation of the novation, ARL and AAL made their intent and reasoning very clear to the Government as reflected, in part, by the following comments:

### March 11, 2013 email from AAL's Paul Daigle to the Government:

*We feel that this can quickly be rectified by resolving the open action of the Novation Agreement, to which both parties wholly agree and is especially beneficial to the USG – followed by the resultant contract modification wherein the contract is reverted to USD, and AAL-USA's bank account may receive funds from this program as per the terms of the MOU.*

### March 21, 2013 letter from ARL's C. Scott Terrell, to the Government:

*While the path forward for the Novation Agreement is being worked between PM NSRWA, AMCOM Legal, and our own corporate legal counsel, ARL and the PdM Mi-17/35 office have identified a short term solution to the funding issues resultant of the Afghan banking institutions in Kabul and the Afghan Customs Seizure on 17 Dec 2012. This interim path will prevent any work stoppages or delays on contract W91B4M-11-C-0007:*

*- ARL will open a separate entity/bank account in the United States*

*- This banking information will be reflected in the System for Award Management (SAM) as the EFT site for payments on USG contracts*

*- ARL's invoices will also be updated to reflect the new banking information*

*- ARL will submit outstanding/withheld invoices to the COR ASAP*

*ARL requests that you grant concurrence to this proposed solution and agree to issue a contract modification when the banking institution has been established and all updates have been made.*

### April 9, 2013 email from Mr. Daigle to the Government:

*As a result, ARL (a wholly separate company from AAL Group, who uses AAL Group as their subcontractor with MMHP and IAC certifications for all services under W91B4M-11-C-0007) has not been able to pay its subcontractors since December 2012. ARL's subcontractors, AAL Group Ltd and AAL USA Inc., have gone at risk by $6,612,259.45 USD. This should show ARL/AAL's dedication to providing critical services to the USG and the US Warfighter. But this cannot continue.*

*ARL proposed a Novation Agreement (in October 2012 as a foresight into deteriorating conditions on KAIA and again in February 2013 after the situation had gone beyond resolution) as the only possible means to resolve this pay issue due to the events depicted in the synopses attached. Multiple other avenues of resolution, such as EFT changes, change of banking institution, etc., have been stymied as ACC and DFAS have determined that the contract cannot be changed to a different bank account due to the requirement to fund in Afghani currency.*

*The original ARL/AAL proposal, along with each additional proposal for every program on contract have been proposed in USD. The contract was awarded in*

April 9, 2014
Page **4** of **4**

> *USD and is funded in USD. The contract was only switched to Afghani upon the insistence of ACC for ARL to invoice through WAWF.*
>
> *It now appears that a Novation Agreement is the only feasible path to resolution on this payment issue. Tomorrow morning, ARL will submit a third Novation Agreement packet for consideration, based on the discussions from Monday with the AMCOM Legal Advisor. If this Agreement cannot be exercised, all ARL programs will be ceased until the issue is resolved. This includes the SMW TN 930 overhaul/heavy repair/cockpit modification, and all AMPS installation for SMW aircraft.*

ARL and AAL were not alone in their understanding that the requirement to pay contractors in Afghani, deposited in Afghan banks, only applied where the contractor was an Afghan company. The Government demonstrated the same understanding on at least two (2) occasions. The first such demonstration occurred on April 24, 2013, when the Department of Defense issued a class deviation (the "Class Deviation"). The Class Deviation, which was properly promulgated and published in accordance with FAR 1.404 and was immediately effective for all solicitations for performance in Afghanistan, provided as follows:

> *NOTIFICATION OF PAYMENT IN LOCAL CURRENCY (AFGHANISTAN) (APR 2013) (DEVIATION 2013-O0011)*
>
> *(a)    Pursuant to the authority of USCENTCOM FRAGO's 09-1567 and 10-143, this contract will be awarded in Afghani (local currency) if awarded to a host nation vendor. The Contractor will receive payment in local currency via Electronic Funds Transfer (EFT) to a local (Afghan) banking institution. Contracts/purchase orders shall not be awarded to host nation vendors who do not bank locally.* **If awarded to other than a host nation vendor, the contract will be awarded in US dollars.**

(Emphasis added.) While the Class Deviation was not incorporated into the Contract, it further clarifies the Government's intent to impose an Afghan payment requirement only on host nation vendors.

On May 2, 2013, the Government issued Contract Modification No. P00021, which incorporated Joint Theater Support Contracting Command Local Instruction 952.232-0004 (the "LI"), which stated in relevant part:

> PAYMENT IN LOCAL CURRENCY (AFGHANISTAN)   DEC/2011
>
> *Pursuant to the authority of USCENTCOM FRAGO's 09-1567 and 10-143 this contract is awarded in Afghani (local Currency),* **if awarded to a host nation vendor.** *The contractor will receive payment in local currency via electronic Funds Transfer to a local (Afghan) banking institution.*

(Emphasis added.) Once again, the Government clearly indicated its intent that the Afghani payment requirements be applied **only** where the prime contractor was Afghani.

ARL and AAL executed a novation agreement dated April 7, 2013 and submitted it to the Government on April 12, 2013 (the "Novation"). On May 3, 2013, one day after incorporating

April 9, 2014
Page 5 of 5

the LI into the Contract, the Government accepted and incorporated the Novation via Contract Modification No. P00022.

Particularly in light of the Class Deviation and the LI, both of which were issued prior to the Government's acceptance of the Novation, AAL presumed that the Novation would eliminate the impediments to its ability to receive payment and that it would be paid for its services, in U.S. Dollars, remitted to a non-Afghan bank account. Indeed, that such a result was required by the Contract. Unfortunately, however, the required result did not occur.

Despite the Novation, the Government took the position that any payment to AAL under the Contract had to be made in Afghani to an Afghan bank account. Furthermore, from the date of the Novation, the Government stated it would not process any invoices until AAL provided payment information for an Afghan bank account. However, AAL could not obtain an Afghan bank account because it is not an Afghan entity, a fact which was made clear to the Government.

AAL made myriad attempts to convince the Government of the error in its position, to no avail. Ultimately, having never been paid for its services, and facing the prospect of continued performance without payment, in an effort to mitigate its damages and receive partial payment,[1] offered to accept payment in Afghani provided that it was paid to a non-Afghan account, and submitted two (2) invoices designed to accomplish that end. The Government refused to pay either of these invoices and insisted that AAL obtain an Afghan bank account for payment. The Government continued to assert that payment in anything but local Afghani to anything but a local Afghan bank account was impossible.

Its efforts having been once again thwarted by the Government's misplaced insistence on paying in Afghani delivered to an Afghan account, AAL again attempted to obtain partial payment (accounting for exchange losses) by providing AAL with the bank account information for its sister company, AAL Group, Ltd. ("AAL Afghanistan"). Unlike AAL, AAL Afghanistan was an Afghan entity and was able to obtain an Afghan bank account. AAL clearly indicated to the Government that the bank account belonged to AAL Afghanistan, not AAL – the prime contractor on the Contract. It was AAL's understanding that, upon receipt of payment by the Government, AAL Afghanistan would be able to transfer the funds to AAL.

After several meetings in July of 2013, the Government finally agreed to process six of the seventeen invoices that AAL had submitted.[2]  With respect to the six invoices that the Government agreed to pay, the Government insisted that it would only make payment at a "predetermined contractually mandated exchange rate" of between 40-50 Afghanis per U.S. Dollar. There was no contractual authority for the Government to use said "predetermined contractually mandated exchange rate," which was significantly lower than the floating rate. Desperate for funding, as a further effort to mitigate its losses, AAL converted its invoices, which were originally in U.S. Dollars, to Afghanis by applying the "predetermined contractually mandated exchange rate."

---

[1] Because the payment would have been made in Afghani, AAL would have incurred a loss as a result of the currency exchange, leaving it with less than the amount of U.S. Dollars due under the Contract for its services.

[2] The Government refused to process the remaining eleven invoices because the aforementioned DFAS audit erroneously showed under-funding of various Contract Line Item Numbers.

April 9, 2014
Page 6 of 6

On or about July 24, 2013, the Government processed the six invoices and nonsensically **paid in U.S. dollars**, but only after converting the Afghani invoice price at the then-current exchange rate of 56.120. The Government arbitrage resulted in payment to AAL in an amount substantially less than that required by the Contract, **which was bid and funded in U.S. Dollars**. The arbitrage loss was not the only problem that AAL encountered with these payments.

Just as the monies remitted to ARL were frozen by the Afghan bank to which they were paid, the bank into which the aforementioned payment to AAL Afghanistan was deposited, the Afghanistan International Bank ("AIB") likewise froze the funds remitted to AAL Afghan account. AIB refused to release the funds to AAL Afghanistan unless it produced a contract with the U.S. Army. Obviously, because AAL Afghanistan did not have a contract with the U.S. Army, no such contract could be produced. AAL Afghanistan and AAL tried to explain the situation to AIB, but the AIB officials refused to engage in meaningful dialogue with AAL. Consequently, AAL was unable to access funds it desperately needed.

After expending substantial resources and energy in negotiating with the Afghan government and trying to open an Afghan bank account, without obtaining requested assistance from the contracting officer, AAL was ultimately forced to reject and return the money to the Government. The Government refused the returned funds, however, and insisted that they be accepted by AAL. Unbeknownst to AAL, the Government contacted AIB to discuss access to the said funds. The Government's explanation, as reflected by its correspondence with AIB, was that a meeting between AAL and the CEO of AIB would resolve the issues. Unfortunately, however, AAL's efforts to have such a meeting and gain access to the said funds, were unsuccessful.

Over the last few months, AAL has continued to attempt good faith negotiations with the Government in order to resolve this dispute, including sending its in-house attorney to Afghanistan to attempt to negotiate with AIB and many attempts by outside counsel to assist in brokering a solution. All of AAL's efforts were unsuccessful and resulted in the Government's continued failure to pay AAL for amounts due and owing under the Contract.

## LEGAL AUTHORITY

### A.    The Novation Eliminated Any Requirement That Payments be Made to an Afghan Bank in Afghani.

The legal effect of a novation agreement is well settled. As a matter of law, novation agreements operate to extinguish any previous agreement. Hicks v. United States, 89 Fed. Cl. 243, 257 (2009) (citing Cincinnati Ins. Co. v. Leighton, 403 F.3d 879, 887 (7th Cir. 2005); Richard A. Lord, Williston on Contracts § 76:11 (9th ed. 2004)); see also In the Matter of Vialease Corporation, 58 Comp. Gen. 108, 111, B-192354, 78-2 CPD ¶ 405 (1978); Appeal of Puyallup Tribe of Indians, 88-2 BCA ¶ 20640, ASBCA No. 29802 (1988); see also Appeal of Dynamics Corp. of America, 78-1 BCA ¶ 13115, ASBCA No. 22259 (1977). "A novation is a new contractual relation that has four requisites: (i) a previous valid obligation; (ii) the agreement of all the parties to the new contract; (iii) the extinguishment of the old contract; and (iv) the validity of the new one." Hicks, 89 Fed. Cl. at 257. A novation operates to substitute the original party to a contract with a new one. Insurance Co. of the West v. United States, 100 Fed. Cl. 58, 67 n.9 (2011). Accordingly, the transferee is considered the original contractor after novation. Hicks, 89 Fed. Cl. at 257.

April 9, 2014
Page 7 of 7

The well-settled effect of a novation agreement is precisely the effect that the parties intended with the Novation. The language in the Novation is essentially identical to that provided in FAR 42.1204, and expressly provides:

> The Transferee also assumes all rights, obligations and liabilities of, and all claims against, the Transferor under the contracts **as if the Transferee were the original party** (Transferor) **to the contracts**. . . . The Transferee by this Agreement becomes entitled to all rights, titles, and interests of the Transferor in and to the contracts **as if the Transferee were the original party** (Transferor) **to the Contracts**. Following the effective date of this Agreement, the term "Contractor," as used in the contracts, shall refer to the Transferee.

The Novation, ¶¶ (b) (2) & (4) (emphasis added). The Government approved the Novation. Consequently, the parties' intent as expressed by the plain language of the Novation must be given effect. The plain language shows that the parties intended for the Contract to continue "as if [AAL] were the original party to the Contract." The plain meaning of this phrase is to give effect to the terms of the Contract as they apply to AAL as the contractor, not ARL. Clauses that exist in the Contract and/or the FAR that apply to AAL and ARL differently should therefore be given effect as if AAL was originally awarded the Contract.

The language of the Novation is plain in its requirement that AAL be treated as if it were the original prime contractor. However, even if the Novation was in some manner ambiguous (which it is not), the ambiguity would be resolved against the Government, not AAL.

The language of the Novation was taken verbatim from a regulation, FAR 42.1204. Therefore, as a matter of law, the Novation must be construed as a regulation. See Raytheon Co. v. United States, 105 Fed. Cl. 236, 255 (2012) (citing Honeywell, Inc. v. United States, 661 F.2d 182, 186 (Ct. Cl. 1981)). In construing the Novation, the promulgators of FAR 42.1204 are considered to be the drafters of its operative language. Id. If the Novation was determined to be ambiguous, the rule of *contra proferentem* would apply and the ambiguity would be construed against the drafter, in this case the Government. Seaboard Lumber Co. v. United States, 19 Cl. Ct. 310, 315 (1990). As such, while AAL contends that the Novation can only be interpreted so as to require the Contract to be construed as if AAL were the original prime contractor, any contrary construction by the Government must be rejected.

The Contract was bid in U.S. Dollars and funded in U.S. Dollars. The Contract itself does not require payment in anything other than U.S. Dollars. AAL is not an Afghan entity and, therefore, neither the LI nor the Class Deviation operate to require payment in Afghani. Similarly, there is no requirement that payment be made to an Afghan bank. Because there is no contractual or other legal requirement that the Government remit payment under the Contract, only in Afghani deposited in an Afghan bank, the Government's refusal to do otherwise is misplaced.

**B.     The Government is estopped from denying AAL's interpretation of the Novation.**

As a matter of law, "a party who willingly and without protest enters into a contract with knowledge of the other party's interpretation of it is bound by such interpretation and cannot later claim that it thought something else was meant." Perry & Wallis, Inc. v. United States, 192

Ct. Cl. 310, 314-15 (1970) (citing Franklin Co. v. United States, 381 F.2d 416, 180 Ct. Cl. 666 (1967)); see also HPI/GSA 3C, LLC v. Perry, 364 F.3d 1327, 1336 (Fed. Cir. 2004); Blue Cross & Blue Shield United of Wis. & Subsidiaries v. United States, 71 Fed. Cl. 641, 649 (2006); Appeals of Space Gateway Support, LLC, 13-1 BCA P 35232, ASBCA No. 55608 (Jan. 29, 2013). This rule applies whether the party had actual knowledge or should have known of the other party's intention. Perry & Wallis, Inc., 192 Ct. Cl. at 315 (quoting Cresswell v. United States, 173 F. Supp. 805, 811, 146 Ct. Cl. 119, 127 (1959)). Once a party is put on notice of the other party's reasonable interpretation of a proposed contract provision, it has a duty to investigate such intended meaning. See id. If the party fails to investigate and signs the contract, it acquiesces in such interpretation and is bound by the same. Id.

Assuming, arguendo, that the plain meaning of the Novation is susceptible to multiple interpretations, the Government is estopped from denying any interpretation other than that advanced by AAL. AAL's intention and interpretation of the Novation and its effect was made clear prior to its submission. The Government was on notice of AAL's intention and interpretation at the time that it accepted the Novation, which it did without protest.

AAL's interpretation of the Novation and its effect is that it requires payment to AAL in U.S. Dollars to a non-Afghan bank account. Even if the Government can articulate an alternate interpretation, it cannot deny that AAL's interpretation is reasonable. The Government neither protested nor inquired about AAL's interpretation of the Novation agreement and executed the Novation per AAL's request. Because the Government failed to investigate AAL's interpretation and executed the Novation agreement, it acquiesced in AAL's interpretation of Novation and its effect, and is bound to make payment under the Contract in U.S. Dollars to a non-Afghan bank account.

## AMOUNTS DUE

The calculation of the amounts owed, as set forth in the supporting material that is incorporated by reference, are as follows:

**$7,416,826.45**, due for work completed but for which payment has not been received, due to dispute regarding contractual payment terms;

**$6,133.46**, due for costs associated with attempting to negotiate opening of bank account in Afghanistan;

**$803,785.88**, due for losses resulting from improper currency conversion for payments made between January 2011 and March 2013;

**$976,398.10**, due to CLIN value errors / misapplied payments made by DFAS on payments made between January 2011 and March 2013; and

**$34,131.94**, due for losses resulting from the Government's failure to intervene after the Afghan government denied AAL landing rights and from the Government's failure to process necessary paperwork allowing AAL to land;

for a total amount of **$9,237,275.83**.

AAL has provided both the factual and legal bases for its claim and requests a final decision on its claim from the CO within 60 days. AAL also requests interest required to be paid

April 9, 2014
Page **9** of **9**

pursuant to the PPA on the unpaid amount.   Because this claim exceeds $100,000.00, the
required certification is below.

Respectfully Submitted,

Oleg Sirbu
Chief Executive Officer
AAL Group, Ltd.
+971 50 980 6748
oleg.sirbu@aal-group.com

April 9, 2014
Page **10** of **10**

## CERTIFICATION

  I certify that the claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable; and that I am duly authorized to certify the claim on behalf of the contractor.

*Oleg Şrbu*

# Exhibit B



**DEPARTMENT OF THE ARMY**
**ARMY CONTRACTING COMMAND - REDSTONE**
**BUILDING 5303 MARTIN ROAD**
**REDSTONE ARSENAL, ALABAMA  35898-5000**

July 16, 2014

REPLY TO
ATTENTION OF
CCAM-NS-C
14-0234

Oleg Sirbu
AAL Group, Ltd.
Plot of Land 04-02 SAIF Zone
Sharjah, AE
United Arab Emirates (UAE) 8231

SUBJECT: AAL Group, Ltd., Certified Claim under Contract W91B4M-11-C-0007

Dear Mr. Sirbu,

The U.S Government received and considered the claim submitted by AAL Group Ltd (AAL), including the rational and supporting data pertaining to the claim.  The event surrounding the basis of this claim have been the subject of extensive efforts by the Government Team over an extended period to assist AAL in resolving its difficulties in obtaining payment for services rendered under the contract.

The terms of this contract, which was awarded on December 7, 2010, requires that all payments made be paid in Afghan currency with payments by the US Government via electronic funds transfer to an Afghan Bank.  The arrangements between the prime contractor and its subcontractors concerning payments under the contract do not change the terms of the government contract, which requires that payment be made to an Afghan bank in Afghan currency.  The US Government agreed to the novation agreement, which was to allow AAL to be substituted as the contractor for ARL.  It did not alter the terms of the contract between the government and the contractor who assumed the responsibilities under the contract.  The difficulties encountered by AAL in receiving payment from the Afghan bank is a matter to be resolved between AAL and the bank.

The US Government will process for payment, according to the terms of the contract; all amounts presently due AAL under the contract.  This amount is the difference between the amount which has been paid by the US Government and the total amount of the current contract value, less any amount owed by the contractor to the government.  The invoice(s) submitted for such should be stamped as "final invoice" and submitted in accordance with standing invoice instructions.

CCAM-NS-C
14-0234
SUBJECT: AAL Group, Ltd., Certified Claim under Contract W91B4M-11-C-0007

Your claim for the other amounts set out in your letter of April 9, 2014, which total $1,820,449.38 is hereby denied.

This is the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the Armed Services Board of Contract Appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number.

With regard to appeals to the Armed Services Board of Contract Appeals, you may, solely at your election, proceed under the board's (1) small claim procedure for claims of $50,000 or less or, in the case of a small business concern (as defined in the Small Business Act and regulations under that act), $150,000 or less, or (2) Accelerated procedure for claims of $100,000 or less.

Instead of appealing to the Armed Service Board of Contract Appeals, you may bring an action directly in the United States Court of Federal Claims (except as provided in the Contract Disputes Act of 1978, 41 USC 603, regarding Maritime Contracts) within 12 months of the date you receive this decision.

If additional information is required, please contact Velma L. Howard at the Army Contracting Command, CCAM-NS-C, Redstone Arsenal, AL 35898, telephone 256-313-5551, e-mail velma.l.howard.civ@mail.mil or the undersigned at telephone 256-842-3207, edgar.f.sanchez.civ@mail.mil.

Sincerely,

Edgar F. Sanchez
Contracting Officer

Copy Furnished:
Jeannie Williams, SFAE-AV-NS-B

Acknowledge Receipt:_____ Date:_____

AN EQUAL OPPORTUNITY EMPLOYER